# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARGARET FITZPATRICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 CV 0069 |
| v. ) | |
| ) | Honorable Michael T. Mason |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant, Margaret A. Fitzpatrick ("Claimant" or "Fitzpatrick"), brings this motion for summary judgment [18] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Fitzpatrick's claim for disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act ("SSA"), 42 U.S.C. §§ 216(i) and 223(d). The Commissioner filed a cross-motion for summary judgment [29], asking the Court to affirm her decision. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Fitzpatrick's motion for summary judgment [18] is granted, and the Commissioner's motion for summary judgment [29] is denied. The case is remanded for further proceedings consistent with this opinion.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Asture as defendant in this suit.

I.  **BACKGROUND**

   A.  **Procedural History**

Fitzpatrick filed an application for disability insurance benefits on December 1, 2009, alleging a disability onset date of June 20, 2009. (R. 18.) Claimant alleged she was disabled as a result of diabetes mellitus, hypertension, obesity, lumbar degenerative disc disease ("DDD"), osteoarthritis ("OA") of the bilateral knees, coronary artery disease ("CAD"), and sleep apnea. (R. 20.) Her application was initially denied on March 4, 2010 and again on June 3, 2010 after a timely request for reconsideration. (R. 56, 57.) Thereafter, on July 2, 2010, Fitzpatrick requested a hearing, which was held on June 27, 2011 before Administrative Law Judge Karen Sayon ("ALJ" or "ALJ Sayon"). (R. 18, 25, 30.) On July 12, 2011, ALJ Sayon issued a written decision denying Fitzpatrick's request for benefits. (R. 18-25.) Fitzpatrick filed a timely request for review, which the Appeals Council denied on November 16, 2012. (R. 1-6.) The ALJ's decision denying benefits was adopted as the final decision by the Commissioner. *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Fitzpatrick subsequently filed this action in the District Court.

   B.  **Medical Evidence**

On May 17, 2006, Fitzpatrick underwent a Myocardial Perfusion Scan and a Stress Cardiolite at Advocate Christ Medical Center. (R. 247-48.) These tests revealed an "apparent anterolateral defect" and "mild nondiagnostic EKG changes at peak stress." (*Id.*) On May 24, 2006, Fitzpatrick had a cardiac status evaluation. (R. 233.) During this evaluation, Claimant complained of "feeling more fatigued and tired

recently." (*Id.*) Claimant also reported that on some days she could walk "about one to two blocks without any chest pain," and that she had quit smoking one month prior to the visit. (*Id.*) The evaluator noted that "patient's recent 2-D echocardiography was relatively unremarkable; however, the patient's Cardiolite stress test revealed a possible anterolateral defect of the anterolateral wall…" and noted that "attenuation needs to be considered also." (*Id.*)

In June of 2006, Fitzpatrick had three cardiac procedures at Advocate Christ Medical Center. (R. 246.) They included a selective coronary angiography, left ventricular angiography, and an angioseal administration. (*Id.*) The procedures were completed without any complications and the following observations were noted by cardiologist Sunitha R. Avula, M.D. ("Dr. Avula"): "minimal luminal irregularities of the right coronary artery in the range of 10% to 20% but no critical stenosis, tortuous coronary arteriography, and preserved left ventricular systolic function." (*Id.*)

On September 6, 2006, Nasser Zakieh, M.D. ("Dr. Zakieh") saw Fitzpatrick for a follow up and to review her sleep study. (R. 245.) Dr. Zakieh noted that during her last visit, Fitzpatrick's "apnea hypopnea index" was 6.4 with a minimum oxygen saturation of 72%. (*Id.*) He also noted that Fitzpatrick may need oxygen supplementation and that she may suffer from chronic obstructive pulmonary disease due to her history of heavy smoking. (*Id.*) Dr. Zakieh recommended that Fitzpatrick lose weight and participate in a continuous positive airway pressure titration sleep study. (*Id.*)

Fitzpatrick's blood tests from June 2, 2008, indicated that she had a suboptimal glycemic control level of 12.3%.[2] (R. 258.) Fitzpatrick had additional blood tests on

---

[2] Good to fair control is 7% - 8%. (R. 258.)

April 15, 2009, which indicated that she again had a suboptimal glycemic control level of 14.7%. (R. 278.) Another blood test in January of 2010 indicated her glycemic control was 13%. (R. 275).

On May 28, 2009, Dr. Francis Jamilla, performed a pulmonary function test on Fitzpatrick to evaluate her shortness of breath. (R. 255.) Spirometry testing suggested a low FVC[3], a normal FEV-1[4], and a supranormal FEV-1/FVC[5] ratio. (*Id.*)

On January 4, 2010, Claimant visited Dr. Avula for a follow-up appointment, and to have her disability forms signed. (R. 271.) During this visit, Fitzpatrick reported knee and back pain, walking restrictions, smoking one pack of cigarettes a day and that she "didn't go back for her CPAP," machine to treat her sleep apnea. (*Id.*) Claimant also reported dyspnea with exertion, but the physician noted that Fitzpatrick did not have chest pain or palpitations. (*Id.*)

On January 26, 2010, Fitzpatrick again visited Advocate Christ Medical Center and complained of pain in her hip, back, and knee, and of her inability to stand for long periods of time. (R. 269.) She further explained that she took Ibuprofen and Tylenol to help alleviate this pain. (*Id.*) Fitzpatrick also stated that she needed her scooter to

---

[3] Forced Vital Capacity. This is the total volume of air expired after a full inspiration. Patients with obstructive lung disease usually have a normal or only slightly decreased vital capacity. Patients with restrictive lung disease have a decreased vital capacity.
[4] Forced Expiratory Volume in 1 Second. This is the volume of air expired in the first second during maximal expiratory effort. The FEV-1 is reduced in both obstructive and restrictive lung disease. The FEV-1 is reduced in obstructive lung disease because of increased airway resistance. It is reduced in restrictive lung disease because of the low vital capacity.
[5] The FEV-1/FVC ratio "is the percentage of the vital capacity which is expired in the first second of maximal expiration. In healthy patients, the FEV-1/FVC is usually around 70%. In patients with obstructive lung disease, FEV-1/FVC decreases and can be as low as 20-30% in severe obstructive airway disease. Restrictive disorders have a near normal FEV-1/FVC." Https://meded.ucsd.edu

travel long distances. (R. 270.) During this visit, Dr. Avula ordered x-rays of Fitzpatrick's back, hips and knees. (R. 281-83.) Dr. Avula's review of Fitzpatrick's back x-ray revealed "lumbar spondylosis with facet arthritis" and "degeneration of the L5-S1 disc." (R. 281.) Dr. Avula noted that Fitzpatrick's hip x-ray indicated that there were vascular calcifications, "no significant bony or soft tissue pathology," and "inferior lumbar spondylosis." (R. 282.) Dr. Avula's review of Fitzpatrick's knee x-rays also revealed vascular calcifications with a finding of "osteoarthritic changes in the knees greater on the right." (R. 283.) The main point of this visit was "to have disability forms signed." (R. 269.)

On February 17, 2010, Dr. Mahesh Shah conducted an independent medical evaluation at the request of the Bureau of Disability Determination Services for the State of Illinois. (R. 299-302.) Dr. Shah noted that Claimant did not seem to suffer from acute distress and walked into the office without an assistive device. (R. 300.) Dr. Shah also noted that Claimant's hips and knees revealed mild tenderness without any swelling or deformity. (R. 301.) He also noted Claimant's lumbar range of motion: flexion was seventy degrees, extension was ten degrees, and straight leg raising was thirty degrees bilaterally. (*Id.*) From these observations, Dr. Shah concluded that Claimant had a full range of motion. (*Id.*) Additionally, he noted that Claimant's gait was normal but slow, that Claimant was able to heel-walk and toe-walk with some discomfort, and that Claimant was able to partially squat. (*Id.*) Dr. Shah concluded that Fitzpatrick was suffering from arthritis in the lumbar spine, hips, and knees, from high blood pressure and diabetes, which are medically controlled, and from heart disease, which was previously treated with an angioplasty with stenting. (R. 302.) Lastly, Dr. Shah noted

5

that Claimant was mildly obese, which could exacerbate her medical problems. (*Id.*)

On March 3, 2010, Dr. Charles Kenney, an independent medical consultant, issued a Physical Residual Functional Capacity Assessment ("RFC"). (R. 290-97.) Dr. Kenney found that Claimant could stand and walk for up to six hours in an eight hour workday and sit for a total of six hours in an eight hour workday, and he recommended that she avoid concentrated exposure to fumes and odors. (R. 291, 294.) He stated that Fitzpatrick's "exam in its entirety was within normal limits." (R. 292.) Dr. Kenney's conclusions were based on Claimant's medical records; he did not examine her personally. (R. 291.)

Fitzpatrick visited Oak Forest Hospital on April 22, 2010, for hyperglycemia, hypertension, and to refill her prescription medications. (R. 329.) Claimant reported her pain as zero. (R. 326.) Her hyperglycemia was reported at 720.29 and her hypertension at 401.29. (R 329.) Fitzpatrick visited Oak Forest Hospital again on August 28, 2010 to refill a prescription. (R. 355.) Claimant reported her pain as one out of ten, and complained of having achy arms for the past year. (R. 353, 355.)

On May 26, 2010, Dr. Young-Ja Kim, a medical consultant, affirmed Dr. Kenney's RFC issued on March 3, 2010. (R. 305.) Dr. Kim noted "claimant indicates no worsening of impairments, no new limitations, no new allegations, an updated treating source, and no changes in ADLs." (*Id.*)

On November 25, 2010, Fitzpatrick again visited Oak Forest Hospital for a refill of her prescription medication. (R. 362.) At this visit, she reported a pain level of three on a scale of 1 to 10, with ten being the worst. (*Id.*) Her primary concern during this visit was pain and swelling in both feet. (R. 365.) Claimant visited Oak Forest Hospital

6

again on February 25, 2011 for another refill of her prescription medications. (R. 374.) Her pain level was not recorded during that visit. (R. 372, 373.)

### C. Claimant's Testimony

At the time of the June 27, 2011 hearing, Fitzpatrick, a sixty-year old woman, weighed 240 pounds and lived with her brother. (R. 37.) Fitzpatrick testified that she completed tenth grade high in high school and that she had experience as a hospital housekeeping supervisor. (R. 37-38.) Fitzpatrick had a driver's license and testified that she had no problems driving. (R. 37.)

Fitzpatrick testified that because of issues with her back, hip, and feet, she has been unable to work since June of 2009. (R. 42.) Fitzpatrick testified that her back problems, which began in 2008, worsened in 2009 and 2010. (*Id.*) Fitzpatrick also testified that she had swelling and numbness in her feet daily and pain in her back and hip. (R. 48.)

The Claimant testified that she used a motorized scooter for the last five years that she worked at the hospital. (R. 39.) Claimant also testified that, although she did not have a prescription for the scooter, she used it every day at her prior job as a hospital housekeeper. (R. 39-40.) Fitzpatrick testified that she used the scooter at work because she could not do all the walking required by her position. (R. 39.) Claimant testified that, without the scooter, she can only walk half a block or stand for about five minutes before her knees, hips, and back start hurting, and she must sit down to rest. (R. 40.) Claimant also testified that for the past year, she relied on a cane when walking short distances and when her scooter is not available. (R. 42.)

Additionally, Fitzpatrick testified about her neuropathy, diabetes, and shortness

7

of breath. (R. 43-45.) Regarding her neuropathy, Claimant testified to having symptoms of numbness and sharp pains at night for approximately the past three years. (R. 43.) Regarding her diabetes, Claimant testified that she did not always follow her diet, but checked her sugars daily, and complied with all of her prescriptions. (R. 43-44.) She also testified to experiencing breathing problems, specifically shortness of breath, when walking. (R. 44.) Claimant also testified to smoking about a pack and a half of cigarettes a day. (*Id.*)

Claimant testified about her daily activities. (R. 45-48.) Fitzpatrick described a typical day as waking up, eating breakfast, and alternating between sitting in a chair and lying down due to her back pain. (R. 45-46.) She has no hobbies, and keeps herself occupied by watching television. (R. 45-46.) Fitzpatrick testified that she can do chores such as cleaning, washing dishes, and laundry for approximately five minutes at a time. (R. 45-46.) Fitzpatrick indicated that she no longer has the energy required for a full-time job and has to take naps during the day as she is not able to sleep through the night. (R. 47-48.)

### D. Vocational Expert's Testimony

Roy Pagello ("VE"), a vocational and rehabilitation consultant also testified at Fitzpatrick's hearing. (R. 49-54.) The VE reviewed Claimant's file and was present throughout the hearing. (R. 49.) The VE testified that Fitzpatrick worked as a head hospital housekeeper for twenty-five years, which was a skilled position with a light level of physical tolerance. (R. 50.) The VE also testified that housekeeping, within the hospital setting, has a medium level of physical tolerance, but that Claimant performed at a light level because of the accommodation which allowed her to use a motorized

8

scooter. (*Id.*)

The ALJ asked the VE to determine if a hypothetical individual with the same educational and work background as the Claimant, who is only able to perform light work that involves no concentrated exposure to respiratory irritants, would be able to find jobs such as her past work as a head hospital housekeeper. (*Id.*) The VE testified that, yes, Claimant would be able to do her past work, both as performed by the hypothetical person and as generally performed. (R. 50-51.) However, the ALJ and VE noted that the role of head hospital housekeeper requires industry specific skills that are not directly transferrable to other sedentary occupations. (R. 51.)

The ALJ also asked the VE if this same hypothetical individual would be able to find a job as a hospital housekeeper if she required an accommodation of a motorized scooter in order to do the job. (*Id.*) The VE responded that she would not be able to find such a job. (*Id.*) The VE further stated that his testimony was consistent with the information contained in the *Dictionary of Occupational Titles* ("DOT"). (*Id.*)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and includes "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire

9

administrative record, but we will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)(quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support of an adequate discussion of the issues." *Id*. Though the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(*per curiam*) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis Under the Social Security Act

To be entitled to disability insurance benefits under the Act, the claimant must establish that she is disabled. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ("a listing-level impairment"), (4) if the claimant does not have a conclusively disabling impairment, whether she can perform

her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis, though she determined that she did not need to reach step five. At step one, ALJ Sayon found that Fitzpatrick had not engaged in substantial gainful activity since June 20, 2009, the alleged disability onset date. (R. 20.) At step two, the ALJ found that Claimant's diabetes mellitus, hypertension, obesity, lumbar degenerative disc disease, osteoarthritis of the bilateral knees, coronary artery disease, and sleep apnea were severe impairments. (*Id.*) At step three, the ALJ determined that Claimant did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (R. 21.) Next, the ALJ concluded that Fitzpatrick had the RFC to "perform light work as defined in 20 CFR 404.1567(b), involving no concentrated exposure to respiratory irritants." (*Id.*) At step four, the ALJ determined that Claimant was able to perform her past relevant work, both as she performed it and as the job is generally performed. (R. 23.) As a result, ALJ Sayon determined Fitzpatrick is not disabled and the analysis did not proceed to step five. (R. 24.) The ALJ found that Claimant has not been under a disability from June 20, 2009. (*Id.*)

    **C.**    **The ALJ Properly Analyzed the Medical Evidence**

Fitzpatrick argues that the ALJ failed to properly analyze the medical evidence. Specifically, Claimant argues that the ALJ was required to resolve a conflict regarding Claimant's medical evidence, that the ALJ failed to consider that the state agency doctors did not assess Claimant's full medical records, and that the ALJ erred by speculating about the opinions of Claimant's physicians.

The ALJ is not required to address every piece of testimony and evidence in the record. *Diaz*, 55 F.3d at 308. However, the ALJ cannot discuss only the evidence that favors her ultimate conclusion. *Id.* at 307; *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). The Seventh Circuit has stated that "[w]here a claimant argues that there are fatal gaps or contradictions in the administrative law judge's opinion, thus appealing to the important principle of administrative law that the agency provide a rational articulation of the grounds of its decision, we give the opinion a commonsensical reading rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

First, Fitzpatrick argues that the ALJ was required to resolve the conflict posed by the fact that she has flexion of 70 degrees and extension of 10 degrees and the fact that state agency doctors opined that she has no postural limitations. However, Claimant fails to direct the Court to evidence in the record which illustrates that these two facts pose a conflict. In fact, this Court's review of the record reveals that in addition to finding that the Claimant has flexion of 70 degrees and extension of 10 degrees, the examining physician also noted that "the claimant had a fairly good range of motion." (R. 302.) Consequently, it seems no conflict exists, and that it was proper for the ALJ to rely on the state agency doctor's finding that Fitzpatrick had no postural limitations even though she has some limits in flexion and extension. Because the

12

record reflects that the ALJ properly considered the available medical opinions, this Court cannot order a remand based on Claimant's argument that an unresolved conflict of medical evidence exists.

Next, Claimant argues that Dr. Kenney and Dr. Kim did not base their opinions on her medical record in its entirety and that ALJ Sayon failed to evaluate the supportability of their opinions. 20 C.F.R. § 404.1527(c)(3) requires an ALJ to consider the supportability of a medical opinion when deciding what weight to give that medical opinion. The more consistent an opinion is with the Claimant's record, the more weight the opinion will receive. 20 C.F.R. § 404.1527(c)(4). Claimant argues that there is no evidence indicating that Dr. Kenney and Dr. Kim considered treating records from Dr. Avula. Claimant, however, fails to identify what in the record confirms that Dr. Kenney and Dr. Kim did not base their opinions on the Claimant's entire medical record. Claimant also fails to point to medical evidence that discredits their medical opinions. Nor has she offered a treating physician's opinion that contradicts opinions of the state agency doctors. Because the ALJ's decision to give the state agency doctors' opinions great weight is supported by substantial evidence and because an ALJ is not required to provide a complete recitation of every piece of evidence, we see no reason to remand on this issue. *Diaz*, 55 F.3d at 305.

Finally, Claimant argues that the ALJ erred by speculating about the opinions that Claimant's treating physicians may have. Specifically, the Claimant believes that ALJ Sayon improperly speculated that Claimant's treating doctor did not support her disability claim because the disability forms that were presented to the doctor "were not submitted for inclusion into the record." (Pls. Brief at 9.) However, Claimant's argument

13

does not show that the ALJ committed any legal error.

Claimant argues that *White v. Apfel* requires the Court to remand because, "[s]peculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." 167 F.3d 369, 375 (7th Cir. 1999). In *White*, "[t]he ALJ speculated that the probate court might have released the funds if Mrs. White had pursued the claim more 'vigorously.'" *Id.* In *White*, the ALJ arrived at this conclusion without any evidence from the record. Here, however, the Commissioner correctly points out that, "the ALJ appropriately considered Dr. Auula's [sic] notations regarding Plaintiff's presentation for disability and with disability forms. She reasonably concluded that if Dr. Auula [sic] had completed such forms and supported Plaintiff's claim, Plaintiff would have submitted completed forms." (Defs. Resp. at 6.) *White* is distinguishable from the instant case because the ALJ in *White* improperly speculated, without any evidence, on a possible outcome, where ALJ Sayon properly arrived at an inference based on Plaintiff's medical records. *White* does not apply here because ALJ Sayon made an inference based on evidence rather than a mere speculation. Therefore, we see no need to remand on this issue.

### D. The ALJ Improperly Assessed Claimant's Credibility

Fitzpatrick argues that the ALJ improperly assessed her credibility by failing to consider her impairments in the aggregate, improperly considered her lack of prescription for her assistive ambulating devices, and improperly considered her failure to comply with medical treatment without probing Claimant for this failure. Fitzpatrick argues that ALJ Sayon improperly dismissed her allegations of pain, fatigue, and difficulties with standing, walking, and stair climbing. This Court agrees.

14

An ALJ may not disregard a claimant's statements about the intensity and persistence of pain solely because they are not supported by objective medical evidence. SSR No. 96-7p at 3. The Seventh Circuit has reiterated that "a lack of medical evidence alone is an insufficient reason to discredit testimony." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). When assessing a claimant's allegations of pain, "an applicant's disabilities must be considered in the aggregate." *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011). Additionally, it may be the case that sometimes "obesity or some other health condition merely aggravates a disability caused by something else; it still must be considered for its incremental effect on the disability…." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). The Seventh Circuit has also explained that an "ALJ can appropriately consider a claimant's daily activities when assessing the alleged symptoms." *Craft v. Asture*, 539 F.3d 668, 680 (7th Cir. 2008).

Here, the ALJ, in a conclusory manner, stated that Fitzpatrick's "allegations are not supported by the medical opinions of record or the objective medical evidence." (R. 23.) ALJ Sayon did not articulate why the Claimant's medical records did not support her allegations of pain and in doing so, failed to "build an accurate and logical bridge from the evidence to his conclusion." *Dixon*, 270 F.3d at 1176. The ALJ failed to give specific reasons for discrediting Fitzpatrick's testimony of her alleged pain. *Martinez*, 630 F.3d at 697.

This same deficiency exists in the ALJ's dismissal of Claimant's allegations of her limited ability to perform daily activities and ability to ambulate, without accounting for Claimant's impairments in the aggregate. ALJ Sayon mentioned Fitzpatrick's obesity,

15

but the ALJ's decision does not indicate that her conclusions were made in light of the affect, if any, that Fitzpatrick's obesity may have on her musculoskeletal impairments and her ability to perform daily activities and her difficulties with standing, walking, and stair climbing. The Commissioner failed to address this shortcoming in its response brief.

In assessing Fitzpatrick's credibility, the ALJ also improperly considered Fitzpatrick's lack of a medical prescription for her assistive ambulating devices and Claimant's failure to comply with medical treatment without probing her on this issue. Fitzpatrick argues that "the ALJ failed to properly develop the record, and inquire whether Plaintiff's scooter, cane and walker use was indeed a 'medical necessity.'" (Pls. Brief at 14.) The Claimant is partially correct; the ALJ has a duty to develop the record before determining the claimant is not disabled. 20 C.F.R. § 404.1545(a)(3). However, the Claimant bears the burden of proving the case at steps one through four. *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Therefore, Claimant, through the assistance of her counsel, was responsible for developing the record regarding her need for a cane or scooter. But because Claimant's need for these devices is not easily ascertainable from the record, the ALJ should not have drawn an inference without a proper inquiry. Before discrediting the Claimant for lacking a medical prescription for her ambulating devices, the ALJ should have probed the Claimant's alleged need for these devices. It is unreasonable to discredit a Claimant's use of an assistive ambulatory device without a prescription, as a prescription is not required in order to use a cane or a motorized scooter. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Similarly, the ALJ discredited Claimant because she failed to follow through with

her prescription for a CPAP machine. The burden to develop the record regarding this omission falls on the Claimant, but the ALJ should have at least attempted to determine why Fitzpatrick opted to disregard the prescription, especially if she were going to use that fact to evidence a lack of credibility.

Because the ALJ erred in improperly assessing Fitzpatrick's credibility by failing to consider Claimant's impairments in the aggregate, improperly considering Claimant's lack of prescription for her assistive ambulating devices, and improperly considered Claimant's failure to comply with medical treatment without probing Claimant for this failure, remand is warranted. On remand, the ALJ must make a proper inquiry into the effect Fitzpatrick's obesity has on her musculoskeletal impairments and her ability to ambulate. Additionally, should the ALJ rely on the Claimant's use of an assistive ambulatory device without a prescription and her failure to comply with her physician's CPAP prescription to assess Claimant's credibility, the ALJ must make a proper inquiry as to these omissions.

### E. The ALJ Did not "Impermissibly" Substitute Her Lay Opinion For That of the Physician

Fitzpatrick next argues that the ALJ erred by considering her assessment of the entire medical record and state agency employee observations. The Social Security Administration has explicitly stated that an ALJ "must also consider any observations about the individual recorded by Social Security Administration employees during interviews…." SSR No. 96-7p at 14. Here, Claimant argues that the ALJ improperly relied on recorded observations made by a Social Security Administration Field Office employee. However, SSR No. 96-7p directs ALJs to consider these observations in

17

making their credibility determinations. Thus, the ALJ did not err in considering state agency employee observations.

Claimant also argues that the ALJ impermissibly substituted her own lay opinion for that of the physician when analyzing the Claimant's x-rays of her spine. Particularly, the Claimant is troubled by the ALJ's recitation of the evidence, stating, "x-rays of her lumbar spine showed *only* lumbar spondylosis with facet arthritis and degeneration of the L5-S1 disc" (emphasis added). (R.23.) Claimant reads this recitation of Claimant's medical records as the ALJ "implying the objective findings reported on x-ray were insufficient to cause the symptoms and disabling effects reported." (Pls. Brief at 12.) Claimant's argument is misplaced. We cannot speculate as to what the ALJ implied in adding the adjective "only" to the physician's findings of Claimant's x-rays. Because the ALJ did not substitute her lay opinion for that of the physician when determining Claimant's credibility, remand is not warranted for this issue.

**F.      The ALJ Improperly Determined the Claimant's RFC**

Lastly, Claimant argues that the ALJ improperly determined Fitzpatrick's RFC because she failed to consider if Fitzpatrick's obesity aggravates her sleep apnea and musculoskeletal impairments, and how these aggravated impairments may limit Fitzpatrick's ability to engage in substantial gainful activity. This court finds that ALJ Sayon properly considered the effect Fitzpatrick's obesity has on her sleep apnea, but that the ALJ failed to engage in a similar analysis of the effect Claimant's obesity has on her musculoskeletal impairments.

ALJ Sayon found that Fitzpatrick has the RFC to perform light work, involving no concentrated exposure to respiratory irritants. Engaging in light work includes the ability

18

to lift objects no more than twenty pounds occasionally or ten pounds frequently, a significant amount of walking, and standing or sitting with some pushing and pulling of arm or leg controls. If a Claimant is deemed able to engage in light work, he or she is also deemed able to engage in sedentary work as well. 20 CFR 404.1567(b). In SSR 02-01p, the SSA outlines its policies regarding the role of obesity in disability claims. SSR 02-01p requires an ALJ to consider obesity in determining whether an individual has a medically determinable impairment. SSR 02-1p at 2. If there is no diagnosis of obesity but the evidence includes clinical notes or other medical records showing consistently high body weight, the ALJ should either consult a medical source, or as is done in most cases, use her judgment "to establish the presence of obesity based on the medical findings and other evidence in the case record." SSR 02-01p at 9. Here, ALJ Sayon conducted an individualized assessment and considered the cumulative effects of obesity on the Claimant's functioning and determined that her obesity was severe.

ALJ Sayon acknowledged and discussed the effect of Claimant's obesity on her diagnosed sleep apnea, and explained that it was secondary to her obesity. Additionally, the ALJ noted that Claimant did not follow through with her prescribed treatment for her sleep apnea. Also, the record, including the Claimant's testimony at her hearing, is devoid of the reason why Claimant did not follow through with her prescribed treatment. She cannot expect to be compensated for an ailment that she has not attempted to treat. Remediable conditions are not a basis for an award. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).

In contrast, we do not know what effect, if any, Claimant's obesity has on her

musculoskeletal impairments, as the ALJ's analysis does not make mention of it. It may be that the ALJ believed that Fitzpatrick's obesity is remediable and not completely disabling in itself, however, she made no mention of this and we cannot speculate. In considering the Claimant's ability to engage in light work, "the ALJ would have to determine the effect of her obesity on that ability." *Gentle*, 430 F.3d at 868. "For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." SSR 02-1p. at 17. On remand, the ALJ must make a proper inquiry into Fitzpatrick's ability to engage in substantial gainful activity given the Claimant's musculoskeletal impairments in conjunction with the effects that her obesity may have on these impairments.

## III.  CONCLUSION

For the reasons set forth above, Fitzpatrick's motion for summary judgment [18] is granted. The Commissioner's motion for summary judgment [29] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. Additionally, the Commissioner, on remand, may want to consider – especially in light of the testimony that the use of a scooter would actually preclude past employment – whether it might be necessary to make findings at step five. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:  June 30, 2014**